**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

United States of America,

The Commonwealth of Pennsylvania,

and The State of West Virginia,

     *Plaintiffs*,

v.

Koppers Inc.

     *Defendant*.

| ELECTRONICALLY FILED |
| :---: |
| Nov 02 2020 |
| U.S. DISTRICT COURT |
| Northern District of WV |

Civ. No.    5:20-cv-236 Judge Bailey

## COMPLAINT

The United States of America, by the authority of the Attorney General of the United States and through the undersigned attorneys, and at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), the Commonwealth of Pennsylvania, on behalf of the Pennsylvania Department of Environmental Protection ("PA DEP"), and the State of West Virginia, on behalf of the West Virginia Department of Environmental Protection ("WVDEP"), file this Complaint and allege as follows.

### NATURE OF ACTION

1.    This is a civil action brought pursuant to Section 311(b)(7)(C) of the Clean Water Act, as amended, 33 U.S.C. § 1321(b)(7)(C) ("CWA"), and Section 311(e) of the CWA, as amended, 33 U.S.C. § 1321(e); Sections 601 and 605 of the Pennsylvania Clean Streams Law, Act of June 22, 1937, as amended, 35 P.S. §§ 691.1 – 691.1001, Section 1305 of the Pennsylvania Storage Tank and Spill Prevention Act, Act of July 6, 1989, as amended, 35 P.S. §§ 6021.101 – 6021.2104; and Sections 22-30-16 and 22-30-17 of the West Virginia Above

Ground Storage Tank Act, W. Va. Code §§ 22-30-16 – 22-30-26 for the assessment of civil penalties and injunctive relief against Koppers Inc. ("Koppers" or "Defendant").

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action pursuant to 33 U.S.C. § 1321(n) and 28 U.S.C. §§ 1331, 1345, and 1355.

3.      The Court has supplemental jurisdiction over the PA DEP and WVDEP state law claims pursuant to 28 U.S.C. § 1367 because they are so related to the United States' claims that they form part of the same case or controversy.

4.      Venue is proper in this district pursuant to 33 U.S.C. § 1321(b)(7)(E) and 28 U.S.C. §§ 1391(b), 1391(c), and 1395(a) because Defendant does business, the claims arose, and some of the violations occurred within this district.

5.      Authority to bring this action is vested in the United States Department of Justice under 33 U.S.C. § 1366 and 28 U.S.C. §§ 516 and 519.

6.      Authority to bring this action on behalf of PA DEP is vested in the Pennsylvania Attorney General under 71 P.S. § 732-204.

7.      Authority to bring this action on behalf of WVDEP is vested in the West Virginia Attorney General under W.Va. Code §§ 22-30-16 and 22-30-17.

## DEFENDANT

8.      Defendant is a corporation that is organized under the laws of the Commonwealth of Pennsylvania with its principal place of business at 436 Seventh Avenue, Pittsburgh, Pennsylvania 15219-1800.

9.      Defendant is a "person" within the meaning of Section 311(a)(7) of the CWA, 33 U.S.C. § 1321(a)(7), and 40 C.F.R. § 112.2.

## STATUTORY AND REGULATORY BACKGROUND

*Oil Spill Response Program*

10.     In Section 2(d)(1) of Executive Order 12777 (Oct. 18, 1991), the President delegated to the Administrator of EPA the authority to promulgate regulations under Section 311(j) of the CWA, 33 U.S.C. § 1321(j), for non-transportation-related onshore facilities.  The regulations are codified in 40 C.F.R. Part 112.

11.     Pursuant to Section 311(j)(1)(C) and (j)(5)(A) of the CWA and the President's delegation of authority, in 1994 the Administrator of EPA amended 40 C.F.R. Part 112 by promulgating the Facility Response Plan ("FRP") regulations, codified at 40 C.F.R. §§ 112.20-21, and effective on August 30, 1994.  These spill response regulations require owners or operators of non-transportation-related substantial-harm facilities to, *inter alia*, develop and implement an FRP, an oil spill response training program, and a program of oil spill response drills/exercises.

12.     The definition of "discharge," found at 40 C.F.R. § 112.2, includes any spilling, leaking, pumping, pouring, emitting, emptying or dumping.

13.     The definition of discharge of oil "in harmful quantities," found at 40 C.F.R. § 110.3, includes discharges of oil that: (a) violate applicable water standards; or (b) cause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines.

14.     The definition of "onshore facility," found at Section 311(a)(10) of the CWA, 33 U.S.C. § 1321(a)(10), and 40 C.F.R. § 112.2, means, any facility in, on or under any land within the United States, other than submerged land, which is not a transportation-related facility.

15.    The definition of "non-transportation-related facility," found in 40 C.F.R. Part 112, Appendix A and incorporated by reference at 40 C.F.R. § 112.2, includes oil drilling, producing, refining and storage facilities.

16.    The definition of "owner or operator," found at Section 311(a)(6) of the CWA, 33 U.S.C. § 1321(a)(6), and 40 C.F.R. § 112.2, means, in the case of an onshore facility, any person owning or operating such an onshore facility.

17.    Oil is defined as "oil of any kind or in any form, including, but not limited to: fats, oils, or greases of animal, fish, or marine mammal origin; vegetable oils, including oils from seeds, nuts, fruits, or kernels; and other oils and greases, including petroleum, fuel oil, sludge, synthetic oils, mineral oils, oil refuse, or oil mixed with wastes other than dredged spoil."  40 C.F.R. § 112.2.

*Spill Prevention, Control, and Countermeasure Regulations*

18.    The Spill Prevention, Control, and Countermeasure ("SPCC") Regulations, authorized pursuant to Section 311(j)(1)(C) of the CWA, 33 U.S.C. § 1321(j)(1)(C), and codified at 40 C.F.R. §§ 112.1-12, apply, in relevant part, "to any owner or operator of a non-transportation-related onshore or offshore facility engaged in drilling, producing, gathering, storing, processing, refining, transferring, distributing, using, or consuming oil and oil products, which due to its location, could reasonably be expected to discharge oil in quantities that may be harmful, as described in [40 C.F.R. Part 110], into or upon the navigable waters of the United States or adjoining shorelines."  40 C.F.R. § 112.1(b).

19.    The determination of whether a facility could "reasonably be expected to have a discharge as described in [40 C.F.R. § 112.1(b)]" is based "solely upon consideration of the geographical and location aspects of the facility (such as proximity to navigable waters or

adjoining shorelines, land contour, drainage, etc.) and must exclude consideration of manmade features such as dikes, equipment or other structures, which may serve to restrain, hinder, contain, or otherwise prevent a discharge." 40 C.F.R. § 112.1(d)(1).

20.     The owner or operator of an onshore or offshore facility subject to the SPCC Regulations must prepare in writing and implement an SPCC Plan in accordance with 40 C.F.R. § 112.7 and any other applicable section of 40 C.F.R. Part 112.

21.     Generally, an owner or operator must prepare an SPCC Plan "in accordance with good engineering practices," in writing, with "full approval of management at a level of authority to commit the necessary resources to fully implement the Plan." 40 C.F.R. § 112.7.

22.     The SPCC Regulations require, in relevant part, that facility owners and operators construct all bulk storage tank installations with a secondary means of containment for the entire capacity of the largest single container and sufficient freeboard to contain precipitation. 40 C.F.R. § 112.8(c)(2).

23.     The SPCC Regulations require diked areas to be sufficiently impervious to contain discharged oil. 40 C.F.R. § 112.8(c)(2).

24.     The SPCC Regulations require that facility owners and operators test or inspect each aboveground container for integrity on a regular schedule and whenever they make material repairs. Owners and operators must determine, in accordance with industry standards, the appropriate qualifications for personnel performing tests and inspections, the frequency and type of testing and inspections, which take into account container size, configuration, and design (such as containers that are: shop-built, field-erected, skid-mounted, elevated, equipped with a liner, double-walled, or partially buried). Examples of these integrity tests include, but are not

limited to: visual inspection, hydrostatic testing, radiographic testing, ultrasonic testing, acoustic emissions testing, or other systems of non-destructive testing.  40 C.F.R. § 112.8(c)(6).

25.     The SPCC Regulations require facility owners and operators to keep "comparison records" and to inspect the container's supports and foundations.  In addition, they must frequently inspect the outside of the container for signs of deterioration, discharges, or accumulation of oil inside diked areas.  Records of inspections and tests kept under usual and customary business practices satisfy the recordkeeping requirements.  40 C.F.R. § 112.8(c)(6).

26.     The SPCC Regulations require that facility owners and operators, at a minimum, train their oil-handling personnel in the operation and maintenance of equipment to prevent discharges; discharge procedure protocols; applicable pollution control laws, rules, and regulations; general facility operations; and contents of the facility SPCC Plan.  40 C.F.R. § 112.7(f)(1).

27.     SPCC facility owners and operators are required to schedule and conduct discharge prevention briefings for oil-handling personnel at least once a year to assure adequate understanding of the SPCC Plan for that facility.  Such briefings must highlight and describe known discharges as described in 40 C.F.R. § 112.1(b) or failures, malfunctioning components, and any recently developed precautionary measures.  40 C.F.R. § 112.7(f)(3).

*FRP Regulations*

28.     The FRP Regulations require the owner or operator of an onshore oil storage and distribution facility to first determine, under criteria established by EPA in 40 C.F.R. § 112.20(f)(1), whether, because of the facility's storage capacity and location, that facility could reasonably be expected to cause substantial harm to the environment by discharging oil into or on navigable waters or adjoining shorelines.  40 C.F.R. § 112.20.

29.     A facility is classified as a substantial-harm facility if: (1) the facility transfers oil over water to or from vessels and has a total oil storage capacity greater than or equal to 42,000 gallons, 40 C.F.R. § 112.20(f)(1)(i); or (2) the facility's total oil storage capacity is greater than or equal to 1,000,000 gallons and one of the following is true: (a) it does not have sufficient secondary containment to contain the capacity of the largest above-ground oil storage tank plus freeboard for precipitation within each storage area; (b) the facility is located at a distance (as calculated from the appropriate formula in 40 C.F.R. Part 112, Appendix C) such that a discharge from the facility could cause injury to fish and wildlife and sensitive environments; (c) the facility is located at a distance (as calculated from the appropriate formula in 40 C.F.R. Appendix C) such that a discharge from the facility would shut down a public drinking water intake; or (d) the facility has had a reportable oil spill of at least 10,000 gallons within the last 5 years.  40 C.F.R. § 112.20(f)(1)(ii).

30.     If a facility is determined to be a substantial-harm facility under these criteria, the spill response regulations require the owner or operator of the facility to prepare and submit to EPA an FRP, which details the facility's emergency plans for responding to an oil spill.  40 C.F.R. § 112.20(a).

31.     In order to meet the requirements of 40 C.F.R. § 112.20, an FRP must identify areas within the facility where discharges could occur and the potential effects of the discharges on the environment pursuant to 40 C.F.R. § 112.20(h)(4).  The facility must address response planning in its FRP, and must identify response resources that meet the requirements of 40 C.F.R. Part 112, Appendix E.  40 C.F.R. § 112.20(h)(3)(i).

32.     The FRP Regulations also require the owner or operator of a substantial-harm facility to develop and implement a program of facility response drills/exercises for oil spill response.  40 C.F.R. § 112.21(a).

33.     A program of oil spill drills/exercise must follow either the National Preparedness for Response Exercise Program Guidelines ("PREP Guidelines,"), or an alternative program approved by the Administrator of the applicable EPA Region.  40 C.F.R. § 112.21(c).  The PREP Guidelines were originally published in 1994 and were revised in 2002.  Although the PREP Guidelines were revised again in 2016, the 2002 version of the PREP Guidelines were in effect at all times relevant to this Complaint and citations to the PREP Guidelines reference the 2002 version.

34.     The PREP Guidelines are binding requirements when referenced in a facility's FRP.  PREP Guidelines at p. 4-1.

35.     The PREP Guidelines include equipment deployment exercises whereby the planholder is responsible for exercising all equipment types cited in the plan whether owned or Oil Spill Response Contractor provided.

36.     Pursuant to 40 C.F.R. § 112.20(d)(1), the owner or operator of a facility for which an FRP is required shall revise and resubmit to EPA revised portions of the FRP within 60 days of each facility change that materially may affect the response to a worst case discharge, including:

   a.   A change in the facility's configuration that materially alters the information included in the response plan;

   b.   A change in the type of oil handled, stored, or transferred that materially alters the required response resources;

8

c.   A material change in capabilities of the oil spill removal organization(s) that
provide equipment and personnel to respond to certain discharges of oil;

d.   A material change in the facility's spill prevention and response equipment or
emergency response procedures; and

e.   Any other changes that materially affect the implementation of the response plan.

37.   The Regional Administrator shall review for approval changes to an FRP
submitted pursuant to 40 C.F.R. § 112.20(d)(1) for a facility determined pursuant to 40 C.F.R.
§ 112.20(f)(3) to have the potential to cause significant and substantial harm to the environment.

*Pennsylvania Storage Tank and Spill Prevention Program Regulations*

38.   The Pennsylvania Storage Tank and Spill Prevention Program was established
pursuant to the Commonwealth Clean Streams Law (35 P.S. §§ 691.1-691.1001); the
Commonwealth Storage Tank and Spill Prevention Act (35 P.S. §§ 6021.101-6021.2104); and
section 1920-A of The Administrative Code of 1929 (71 P.S. § 510-20) (hereinafter,
"Commonwealth Tank and Spill Regulations").   The Commonwealth Tank and Spill Regulations
were amended under sections 106, 301(a)(5) and 501 of the Storage Tank and Spill Prevention
Act (35 P.S. §§ 6021.106, 6021.301(a)(5) and 6021.501); section 5(b)(1) of the Clean Streams
Law (35 P.S. § 691.5(b)(1)); and section 105(a) of the Solid Waste Management Act (35 P.S.
§ 6018.105(a)); and section 1920-A of The Administrative Code of 1929 (71 P.S. § 510-20).

39.   The Commonwealth Tank and Spill Regulations set forth tank handling and
inspection requirements.   25 Pa. Code § 245.1 *et seq*.

40.   Under 25 Pa. Code § 245.1 of the Commonwealth Tank and Spill Regulations, an
aboveground storage tank is defined to mean one or a combination of stationary tanks with a
capacity in excess of 250 gallons, including the underground pipes and dispensing systems

connected thereto within the emergency containment area, which is used, will be used, or was used to contain an accumulation of regulated substances, and the volume of which, including the volume of piping within the storage tank facility, is greater than 90% above the surface of the ground.  The term includes tanks which can be visually inspected, from the exterior, in an underground area and tanks being constructed or installed for regulated use.

41.     Under 25 Pa. Code § 245.1 of the Commonwealth Tank and Spill Regulations, an "operator" is defined as a person who manages, supervises, alters, controls or has responsibility for the operation of a storage tank.

42.     Under 25 Pa. Code § 245.1 of the Commonwealth Tank and Spill Regulations, an "owner" includes the following:

    a.  In the case of a storage tank in use on August 7, 1989 or brought into use after August 7, 1989, a person who owns or has an ownership interest in a storage tank used for the storage, containment, use or dispensing of regulated substances;

    b.  In the case of an aboveground storage tank in use before August 7, 1989, but which was no longer in use on August 7, 1989, a person who owned the aboveground tank immediately before the discontinuance of its use as well as a person who meets the definition in subparagraph a;

    c.  In the case of an underground storage tank, the owner of an underground storage tank holding regulated substances on or after November 8, 1984, and the owner of an underground storage tank at the time all regulated substances were removed when removal occurred prior to November 8, 1984.

43.     Under 25 Pa. Code § 245.1 of the Commonwealth Tank and Spill Regulations, "person" is defined to mean an individual, partnership, corporation, association, joint venture,

consortium, institution, trust, firm, joint-stock company, cooperative enterprise, municipality, municipal authority, Federal Government or agency, Commonwealth Department, agency, board, commission or authority, or other legal entity which is recognized by law as the subject of rights and duties.  In provisions of the act prescribing a fine, imprisonment or penalty, or a combination thereof, the term includes the officers and directors of a corporation or other legal entity having officers and directors.

44.      Under 25 Pa. Code § 245.1 of the Commonwealth Tank and Spill Regulations, "tank" is defined to mean a stationary device designed to contain an accumulation of regulated substances and constructed of non-earthen materials, for example, concrete, steel or plastic that provide structural support.

*West Virginia Above Ground Storage Tank Act*

45.      The West Virginia Above Ground Storage Tank Act, W. Va. Code Chapter 22, Article 30 (hereinafter, "WV Tank Act"), was established in 2014 to protect and conserve the water resources of the State and its citizens.  W. Va. Code § 22-30-2, *et seq*.

46.      Under the WV Tank Act, "aboveground storage tank" or "tank" or "AST" means, in relevant part, a device made to contain an accumulation of more than 1,320 gallons of fluids that are liquid at standard temperature and pressure, which is constructed primarily of non-earthen materials, including concrete, steel, plastic or fiberglass reinforced plastic, which provide structural support, more than 90 percent of the capacity of which is above the surface of the ground, and includes all ancillary pipes and dispensing systems up to the first point of isolation. The term includes stationary devices which are permanently affixed, and mobile devices which remain in one location on a continuous basis for 365 or more days.  W. Va. Code § 22-30-3(1).

47.     Under the WV Tank Act, "operator" means any person in control of, or having responsibility for, the daily operation of an aboveground storage tank.  W. Va. Code § 22-30-3(5).

48.     Under the WV Tank Act, "owner" means a person who holds title to, controls or owns an interest in an aboveground storage tank, including the owner immediately preceding the discontinuation of its use.  W. Va. Code § 22-30-3(6).  "Owner" does not mean a person who holds an interest in a tank for financial security unless the holder has taken possession of and operated the tank.  *Id.*

49.     Under the WV Tank Act, "Person," "persons," or "people" means any individual, trust, firm, owner, operator, corporation or other legal entity, including the United States government, an interstate commission or other body, the state or any agency, board, bureau, office, department or political subdivision of the state, but does not include WVDEP.  W. Va. Code § 22-30-3(7).

50.     Under the WV Tank Act, "secondary containment" means a safeguard applied to one or more aboveground storage tanks that prevents the discharge into the waters of the state of the entire capacity of the largest single tank and sufficient freeboard to contain precipitation.  In order to qualify as secondary containment, the barrier and containment field must be sufficiently impervious to contain fluids in the event of a release, and may include double-walled tanks, dikes, containment curbs, pits or drainage trench enclosures that safely confine the release from a tank in a facility catchment basin or holding pond.  Earthen dikes and similar containment structures must be designed and constructed to contain, for a minimum of 72 hours, fluid that escapes from a tank.  W. Va. Code § 22-30-3(17).

51.     Under the WV Tank Act, the Secretary of WVDEP is granted the authority to promulgate emergency and legislative rules as necessary to implement the provisions of the WV Tank Act.  W. Va. Code § 22-30-23.

52.     The regulations implementing the West Virginia Above Ground Storage Tank Act were promulgated pursuant to W. Va. Code § 22-30-23 (hereinafter, "WV AST Regulations") for purposes of governing the registration, construction, installation, upgrading, use, inspection, maintenance, testing and closure of aboveground storage tanks in the State.  The WV AST Regulations can be found at Title 47 of the Code of State Rules ("CSR"), Series 63.

53.     Under CSR § 47-63-2.2, "Aboveground Storage Tank System" or "AST System" means an aboveground storage tank as defined by W. Va. Code. § 22-30-3(1), its piping, and all its ancillary equipment, including dispensing systems, overfill protection devices, secondary containment systems, and any associated release detection equipment, up to the first point of isolation.

54.     For purposes of CSR § 47-63-2.23, "facility" means, in relevant part, a site that currently contains, or is expected to contain, or that has contained an AST system that is situated on the same or geographically contiguous property as the AST System, that is under the same ownership or control, and that may be divided by a public or private right-of-way or an easement.

55.     For purposes of CSR § 47-63-2.27, "impermeable or impervious" means a material of sufficient thickness, density, and composition that it is impenetrable or has a permeability that will prevent the discharge to the lands or waters of the State or any fluid for a period of at least as long as the maximum anticipated time during which the fluid will be in contact with the material.

56.     For purposes of CSR § 47-63-2.48, "petroleum" means crude oil or refined hydrocarbons derived from crude oil such as motor fuels, jet fuels, distillate fuel oils, residual fuel oils, lubricants, used oils and natural gas condensate.

57.     For purposes of CSR § 47-63-2.61, "sufficient freeboard" means adequate additional capacity for the secondary containment structure to contain the full capacity of the largest tank within the structure plus precipitation if it can collect in the structure.

58.     For purposes of CSR § 47-63-2.62, "sufficiently impervious" means a material or structure of enough thickness, density, and composition that it will prevent the discharge of fluids to the lands or waters of the State for a period of time sufficient to allow removal and disposal of the discharged material, but in no case would that time be less than 72 hours.

59.     The WV AST Regulations provide that the owner or operator shall ensure that all regulated ASTs have a secondary containment system that collects and contains an unintentional release from an AST and its ancillary equipment up to the first point of isolation.  CSR § 47-63-10.2.a.  Further, all secondary containment structures are required to be compatible with all substances contained within the containment structure.  CSR § 47-63-10.2.b.

60.     The WV AST Regulations require that the owner or operator ensure that secondary containment for existing regulated AST systems shall be adequately designed and constructed to be sufficiently impervious to prevent the released substance from penetrating the containment structure until the release can be detected and recovered, but in no case will that time be less than 72 hours.  CSR § 47-63-10.2.c.

*Federal and State Civil Penalties*

61.     Section 311(b)(7)(C) of the CWA, 33 U.S.C. § 1321(b)(7)(C) and 40 C.F.R. § 19.4 establish maximum civil penalties for violations of the regulations issued under Section

311(j) of the CWA, 33 U.S.C. § 1321(j).  The maximum civil penalty per day per violation is $37,500 for violations occurring between December 6, 2013 through November 2, 2015, and $48,192 for violations occurring after November 2, 2015.

62.     Both Section 1307 of the Pennsylvania Storage Tank and Spill Prevention Act, 35 P.S. § 6021.1307, and Section 605 of the Pennsylvania Clean Streams Law, 35 P.S. § 691.605, authorize PA DEP to assess a civil penalty for a violation of the respective statute, or a rule, regulation, permit or order of PA DEP pursuant to the statute, not to exceed $10,000 per day for each violation.

63.     Pursuant to W. Va. Code §§ 22-30-16 and 17, the secretary of WVDEP may issue orders, assess civil penalties, institute enforcement proceedings and prosecute violations of the WV Tank Act and WV AST Regulations.  Section 22-30-17(c) establishes that any owner or operator of an aboveground storage tank who fails to comply with any requirement of this article or any standard promulgated by the secretary pursuant to this article is subject to a civil penalty not to exceed $10,000 for each day of violation.

## FACILITIES

64.     At all times relevant to this Complaint, Defendant owned and operated facilities at 300 N. State Street, Clairton, Pennsylvania 15025 ("Clairton Facility"); 100 Koppers Road, Follansbee, West Virginia 26037 ("Follansbee Facility"); and 785 Railroad Street, Green Spring, West Virginia 26722 ("Green Spring Facility").

*Pennsylvania Clairton Facility*

65.     Defendant began operating the Clairton Facility in 1996.

66.     At all times relevant to this complaint, Defendant engaged in drilling, producing, gathering, storing, processing, refining, transferring, distributing, using or consuming oil or oil products at the Clairton Facility.

67.     At all times relevant to this Complaint, Defendant utilized the Clairton Facility to convert crude coke oven tars into liquid pitch and other liquid products such as creosote and chemical oil.

68.     Defendant transferred ownership of the Clairton Facility on October 24, 2018.

69.     At all times relevant to this Complaint, Defendant was the "owner or operator" of the Clairton Facility within the meaning of Section 311(a)(6) of the CWA, 33 U.S.C. § 1321(a)(6), and 40 C.F.R. § 112.2.

70.     The Monongahela River flows approximately 129 miles from West Virginia to its confluence with the Allegheny River in Pennsylvania and supports commercial navigation along its length.

71.     The Clean Water Act defines "navigable waters" as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).  In turn, "waters of the United States" has been defined to include, *inter alia*, all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce; and tributaries to such waters. *See* 40 C.F.R. §§ 122.2 & 110.1 (1993).

72.     The Monongahela River is a "navigable water" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7).

73.     The Clairton Facility is a non-transportation-related facility under the definition incorporated by reference at 40 C.F.R. § 112.2 and set forth in 40 C.F.R. Part 112, Appendix A.

74.     The Clairton Facility is an "onshore facility" within the meaning of Section 311(a)(10) of the CWA, 33 U.S.C. § 1321(a)(10), and 40 C.F.R. § 112.2.

75.     Pursuant to Section 308 of the CWA, 33 U.S.C. § 1318, EPA conducted an inspection of the Clairton Facility on December 14, 2016 ("EPA Clairton Inspection") in order to determine whether the Defendant was in compliance with the SPCC Regulations, 40 C.F.R. §§ 112.1-112.12, and FRP Regulations, 40 C.F.R. §§ 112.20-21.

76.     At the time of the EPA Clairton Inspection, Defendant utilized an Integrated Contingency Plan, which functioned as its SPCC Plan, FRP, and several other regulatory plans at the Clairton Facility (hereinafter, "Clairton ICP").

77.     Based on the Clairton ICP, at the time of the EPA Clairton Inspection, the Clairton Facility had the capacity to store approximately 12,514,605 gallons of oil in aboveground storage tanks regulated under the SPCC Regulations.

78.     At the time of the EPA Clairton Inspection, approximately 3,020,000 gallons of oil were regulated pursuant to the Pennsylvania Storage Tank and Spill Prevention Act at 25 Pa. Code Chapter 245.  As the SPCC regulations and Pennsylvania regulations are not identical with respect to which oil containers are managed under the respective regulations, the regulated storage capacity differs under federal and state laws.

79.     The Clairton Facility is about 1,000 feet from the Monongahela River in Clairton, Pennsylvania.

80.     Due to its location, the Clairton Facility could reasonably be expected to discharge oil in harmful quantities, as defined in 40 C.F.R. § 110.3, into or upon navigable waters of the United States or adjoining shorelines.

17

81.     PA DEP inspected the Clairton Facility on April 6, 2017 ("PA DEP Clairton Inspection") pursuant to the Pennsylvania Storage Tank and Spill Prevention Act, in order to confirm the Facility's compliance with that statute in its management and storage of oil.

*West Virginia Follansbee Facility*

82.     Defendant began operating the Follansbee Facility in 1988.

83.     Defendant has been at all times relevant to this Complaint engaged in drilling, producing, gathering, storing, processing, refining, transferring, distributing, using or consuming oil or oil products at the Follansbee Facility.

84.     Defendant has been at all times relevant to this Complaint the "owner or operator" of the Follansbee Facility within the meaning of Section 311(a)(6) of the CWA, 33 U.S.C. § 1321(a)(6), and 40 C.F.R. § 112.2.

85.     The Ohio River flows southwesterly approximately 980 miles from Western Pennsylvania to the Mississippi River in Illinois and supports commercial navigation along its length.

86.     The Ohio River is a "navigable water" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7).

87.     The Follansbee Facility is a non-transportation-related facility under the definition incorporated by reference at 40 C.F.R. § 112.2 and set forth in 40 C.F.R. Part 112, Appendix A.

88.     The Follansbee Facility is an "onshore facility" within the meaning of Section 311(a)(10) of the CWA, 33 U.S.C. § 1321(a)(10), and 40 C.F.R. § 112.2.

89.     Pursuant to Section 308 of the CWA, 33 U.S.C. § 1318, EPA conducted an inspection of the Follansbee Facility on July 21, 2015 ("EPA Follansbee 2015 Inspection"), in

order to determine whether the Defendant was in compliance with the SPCC Regulations, 40 C.F.R. §§ 112.1-112.12, and the FRP Regulations, 40 C.F.R. §§ 112.20-21.

90.     Pursuant to Section 308 of the CWA, 33 U.S.C. § 1318, EPA conducted an inspection of the Follansbee Facility on April 11, 2018 ("EPA Follansbee 2018 Inspection"), in order to determine whether the Defendant was in compliance with the SPCC Regulations, 40 C.F.R. §§ 112.1-112.12, and the FRP Regulations, 40 C.F.R. §§ 112.20-21.

91.     At the time of the EPA Follansbee 2015 Inspection, Defendant utilized an Integrated Contingency Plan, which functioned as its SPCC Plan, FRP, and several other regulatory plans at the Follansbee Facility ("Follansbee ICP").

92.     At the time of the EPA Follansbee 2018 Inspection, Defendant was still utilizing the Follansbee ICP.

93.     Based on the Follansbee ICP, at the time of the EPA Follansbee 2015 Inspection, the Follansbee Facility had the capacity to store approximately 17,820,628 gallons of oil in aboveground storage tanks regulated under the SPCC regulations.

94.     Based on the Follansbee ICP and interviews with Follansbee Facility personnel, at the time of the EPA Follansbee 2018 Inspection, the Follansbee facility had the capacity to store approximately 8,059,130 gallons of oil in aboveground storage tanks regulated under the SPCC regulations.

95.     At the time of the EPA Follansbee 2015 Inspection, Defendant had the capacity to store approximately 20,772,060 gallons of oil regulated pursuant to the W. Va. Aboveground Storage Tank Act and its associated rules.  As the SPCC regulations and WVDEP regulations are not identical with respect to which oil containers are managed under the respective regulations, the regulated storage capacity differs under federal and state laws.

96.    The Follansbee Facility is upgradient and approximately 150 feet from the Ohio River in Follansbee, West Virginia.

97.    Due to its location, the Follansbee Facility could reasonably be expected to discharge oil in harmful quantities, as defined in 40 C.F.R. § 110.3, into or upon navigable waters of the United States or adjoining shorelines.

98.    The WVDEP inspected the Follansbee Facility on October 17, 2016, March 1, 2018, April 25, 2018, September 27, 2018, April 29, 2019 and September 4, 2019 ("WVDEP Follansbee Inspections").

99.    At the time of the WVDEP Inspections, Koppers owned and operated numerous regulated aboveground storage tanks as defined in W. Va. Code § 22-30-3(13).  Koppers was and remains subject to the W. Va. Aboveground Storage Tank Act and its associated rules.

*West Virginia Green Spring Facility*

100.    Defendant began operating the Green Spring Facility in 1991.

101.    Defendant has been at all times relevant to this complaint engaged in drilling, producing, gathering, storing, processing, refining, transferring, distributing, using or consuming oil or oil products at the Green Spring Facility.

102.    Defendant closed the Green Spring Facility on December 21, 2018.

103.    Defendant was the "owner or operator" of the Green Spring Facility at all times relevant to this Complaint within the meaning of Section 311(a)(6) of the CWA, 33 U.S.C. § 1321(a)(6), and 40 C.F.R. § 112.2.

104.    The North Branch of the Potomac River flows into the Potomac River.  The Potomac River flows from the Potomac Highlands to the Chesapeake Bay and supports commercial navigation along its length.

20

105.    The Potomac River is a "navigable water" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7).

106.    The Green Spring Facility is a non-transportation-related facility under the definition incorporated by reference at 40 C.F.R. § 112.2 and set forth in 40 C.F.R. Part 112, Appendix A.

107.    The Green Spring Facility is an "onshore facility" within the meaning of Section 311(a)(10) of the CWA, 33 U.S.C. § 1321(a)(10), and 40 C.F.R. § 112.2.

108.    Pursuant to Section 308 of the CWA, 33 U.S.C. § 1318, EPA conducted an inspection of the Green Spring Facility on August 29, 2017 ("EPA Green Spring Inspection") in order to determine whether the Defendant was in compliance with the SPCC Regulations, 40 C.F.R. §§ 112.1-112.12.

109.    At the time of the EPA Green Spring Inspection, Defendant utilized an ICP, which functioned as its SPCC Plan and several other regulatory plans, at the Green Spring Facility ("Green Spring ICP").

110.    Based on the Green Spring ICP, at the time of the EPA Green Spring Inspection, the Green Spring Facility had the capacity to store approximately 479,800 gallons of oil in aboveground storage tanks regulated under the SPCC regulations.

111.    The Green Spring Facility is located within approximately a quarter mile from the North Branch of the Potomac River in Green Spring, West Virginia.

112.    Due to its location, the Green Spring Facility could reasonably be expected to discharge oil in harmful quantities, as defined in 40 C.F.R. § 110.3, into or upon navigable waters of the United States or adjoining shorelines.

**COUNT 1**
**FEDERAL-ONLY CLAIM**
**FAILURE TO AMEND SPCC PLAN - CLAIRTON**

113.    The allegations in each of the preceding paragraphs are incorporated by reference herein as though fully set forth at length.

114.    40 C.F.R. § 112.5(a) requires, in relevant part, that a facility owner or operator amend its SPCC Plan within 6 months of a change in facility design, construction, operation, or maintenance that materially affects the facility's potential for the discharge of oil.

115.    Under 40 C.F.R. § 112.5(a), "[e]xamples of changes that may require amendment of the Plan include, but are not limited to: commissioning or decommissioning containers; replacement, reconstruction, or movement of containers, reconstruction, replacement, or installation of piping systems; construction or demolition that might alter secondary containment structures; changes of product or service; or revision of standard operation or maintenance procedures at a facility."

116.    Based on interviews with Clairton Facility personnel, at least 4 tanks, referred to as Tanks M, V-16, V-17, and V-19, had been demolished, and 20 tanks, referred to as Tanks 1, 4, 12, 13, 31, 32, 34, V-11, V-111, V-112 day, V-112 decanter, V-119, V-120, V-121, V-122, V-123, V-124, V-125, V-126, and V-13, had been taken out of service prior to the December 14, 2016 EPA Clairton Inspection.

117.    As of June 2017, Defendant had not amended its Clairton ICP to reflect the changes described in Paragraph 116.

118.    The design, construction, operation, and/or maintenance changes described in Paragraph 116 materially affected Defendant's potential for the discharge of oil at the Clairton Facility because the storage capacity of the facility had changed.

119.     Defendant did not amend its Clairton ICP within 6 months to reflect the changes in facility design, construction, operation, or maintenance referenced in Paragraph 116 as required by 40 C.F.R. § 112.5(a).

120.     By failing to amend the SPCC Plan portion of the Clairton ICP within 6 months of a change in facility design, construction, operation and/or maintenance which materially affected the facility's potential for the discharge of oil, Defendant violated 40 C.F.R. § 112.5(a).

**COUNT 2**
**FEDERAL-ONLY CLAIM**
**SPCC PLAN INADEQUACY - CLAIRTON**

121.     The allegations in each of the preceding paragraphs are incorporated by reference herein as though fully set forth at length.

122.     40 C.F.R. § 112.7(a)(3) requires that the SPCC Plan describe "the physical layout of the facility and include a facility diagram, which must mark the location and contents of each fixed oil storage container and the storage area where mobile or portable containers are located."

123.     40 C.F.R. § 112.7(a)(3)(i) requires, in pertinent part, that the SPCC Plan address the type of oil in each fixed container and its storage capacity.

124.     40 C.F.R. § 112.7(a)(3)(iii) requires, in pertinent part, that the SPCC Plan address discharge or drainage controls such as secondary containment around containers and other structures, equipment, and procedures for the control of a discharge.

125.     At the time of the EPA Clairton Inspection, the Clairton ICP did not mark one of the diesel tanks present at the Clairton Facility in the facility diagram or identify the type of oil and capacity for the diesel tank as required by 40 C.F.R. § 112.7(a)(3) and (a)(3)(i).

126.     At the time of the EPA Clairton Inspection, the Clairton ICP did not address, in any way, secondary containment for tanks V-125, V-113, V-111, and V-301.

23

127.    By failing to mark the diesel tank referenced in Paragraph 125 in the Facility diagram in the Clairton ICP, Defendant violated the requirement in 40 C.F.R. § 112.7(a)(3) that the SPCC plan include a facility diagram making the location and contents of each fixed oil storage container.

128.    By failing to address, in any way, the diesel tank referenced in Paragraph 125 in the Clairton ICP, Defendant violated the requirement in 40 C.F.R. § 112.7(a)(3)(i) that each SPCC Plan address the type of oil in each fixed container and its storage capacity.

129.    By failing to address, in any way, the diesel tank referenced in Paragraph 125 in the Clairton ICP, Defendant violated the requirement in 40 C.F.R. § 112.7(a)(3)(iii) that each SPCC Plan address discharge or drainage controls such as secondary containment around containers.

130.    By failing to address, in any way, discharge or drainage controls such as secondary containment for tanks V-125, V-113, V-111, and V-301 in the Clairton Facility ICP, as referenced in Paragraph 126, Defendant violated 40 C.F.R. § 112.7(a)(3)(iii).

## COUNT 3
## FEDERAL-ONLY CLAIM
## VIOLATION OF INSPECTIONS AND TESTS REQUIREMENT - CLAIRTON

131.    The allegations in each of the preceding paragraphs are incorporated by reference herein as though fully set forth at length.

132.    40 C.F.R. § 112.7(e) requires, in pertinent part, that the owner or operator conduct inspections and tests required by 40 C.F.R. Part 112 in accordance with written procedures developed for the facility.

133.    40 C.F.R. § 112.7(e) requires these written procedures and a record of the inspections and tests, signed by the appropriate supervisor or inspector, to be kept with the SPCC Plan for a period of 3 years.

134.    At the time of the EPA Clairton Inspection, the Clairton ICP provided for inspections of tanks regulated under Pennsylvania regulations.

135.    According to Clairton Facility personnel interviewed during the EPA Clairton Inspection, only Pennsylvania regulated tanks were routinely visually inspected.  Defendant did not routinely visually inspect tanks regulated under only the SPCC regulations.

136.    According to Clairton Facility personnel and based on EPA's review of records, Defendant had not conducted visual inspections on containers not subject to Pennsylvania regulation, such as 27 tanks and drums subject to inspection requirements under 40 C.F.R. § 112.7(e), for the period from December 14, 2014 to December 14, 2016.

137.    By failing to conduct visual inspections on 27 tanks and drums, Defendant violated the requirement in 40 C.F.R. § 112.7(e) that the owner or operator conduct inspections and tests required by 40 C.F.R. Part 112 in accordance with written procedures developed for the facility.

## COUNT 4
## FEDERAL-ONLY CLAIM
## INADEQUATE SPCC TRAINING PROGRAM - CLAIRTON

138.    The allegations in each of the preceding paragraphs are incorporated by reference herein as though fully set forth at length.

139.    40 C.F.R. § 112.7(f)(1) requires that facility owners and operators, at a minimum, train their oil-handling personnel in the operation and maintenance of equipment to prevent

discharges; discharge procedure protocols; applicable pollution control laws, rules, and regulations; general facility operations and the contents of the facility SPCC Plan.

140.    According to information gathered during the EPA Clairton Inspection, specifically statements from the Clairton Facility personnel, Defendant's training program did not include training for oil-handling personnel in discharge procedure protocols and the contents of the facility SPCC Plan, which was incorporated into the Clairton ICP, as required by 40 C.F.R. § 112.7(f)(1).

141.    By failing to have or implement an SPCC training program that met the requirements of 40 C.F.R. § 112.7(f)(1) as described in Paragraph 140, Defendant violated 40 C.F.R. § 112.7(f)(1).

## COUNT 5
## FEDERAL-ONLY CLAIM
## FAILURE TO CONDUCT SPCC INTEGRITY TESTING - CLAIRTON

142.    The allegations in each of the preceding paragraphs are incorporated by reference herein as though fully set forth at length.

143.    40 C.F.R. § 112.8(c)(6) requires, *inter alia*, facility owners and operators to test or inspect each aboveground bulk storage container for integrity ("integrity testing") on a regular schedule and whenever they make material repairs.

144.    At the time of the EPA Clairton Inspection, EPA inspectors observed two 1,000-gallon diesel fuel tanks that were present at Defendant's facility.  At least one of these tanks was marked with a placard noting its contents and these tanks were described by Clairton Facility personnel as containing diesel.

145.    At the time of the EPA Clairton Inspection, each of the tanks referenced in Paragraph 144 was a "bulk storage container" as defined in 40 C.F.R. § 112.2, which required integrity testing pursuant to 40 C.F.R. § 112.8(c)(6).

146.    At the time of the EPA Clairton Inspection, although Defendant had integrity testing records for other bulk storage containers at the Clairton Facility, Defendant did not have integrity testing records for the bulk storage containers referenced in Paragraph 144.

147.    According to Clairton personnel, at the time of the EPA Clairton Inspection, Defendant had not conducted integrity testing on the two 1,000-gallon diesel fuel tanks referenced in Paragraph 144.

148.    By failing to conduct integrity testing on the tanks referenced in Paragraph 144, Defendant violated 40 C.F.R. § 112.8(c)(6).

### COUNT 6
### FEDERAL-ONLY CLAIM
### FAILURE TO REMOVE ACCUMULATIONS OF OIL FROM DIKED AREAS - CLAIRTON

149.    The allegations in each of the preceding paragraphs are incorporated by reference herein as though fully set forth at length.

150.    40 C.F.R. § 112.8(c)(10) requires any accumulations of oil in diked areas to be removed promptly.

151.    At the time of the EPA Clairton Inspection, EPA inspectors observed accumulations of oil in the diked areas surrounding Tank 9.

152.    Based upon conversations with Clairton Facility personnel, the oil in the diked areas surrounding Tank 9 was present for approximately 8 months.

153.    By failing to promptly remove the accumulation of oil within the diked area surrounding Tank 9, Defendant violated 40 C.F.R. § 112.8(c)(10).

27

**COUNT 7**
**FEDERAL-ONLY CLAIM**
**INADEQUATE FRP DRILLS AND EXERCISES - CLAIRTON**

154.    The allegations in each of the preceding paragraphs are incorporated by reference herein as though fully set forth at length.

155.    40 C.F.R. § 112.20(a) provides that "[t]he owner or operator of any non-transportation-related onshore facility that, because of its location, could reasonably be expected to cause substantial harm to the environment by discharging oil into or on the navigable waters or adjoining shorelines shall prepare and submit a facility response plan [FRP]" to EPA.

156.    40 C.F.R. § 112.21(a) provides that "[t]he owner or operator of any facility required to prepare [an FRP] under § 112.20 shall develop and implement a facility response training program and a drill/exercise program that satisfy the requirements of this section."

157.    Under 40 C.F.R. § 112.21(c), "[a] program that follows the National Preparedness for Response Exercise Program (PREP) . . . will be deemed satisfactory for purposes of this section."

158.    Defendant's Clairton ICP stated that it had adopted the PREP Guidelines and, therefore, Defendant was required to fulfill the drills and exercises requirements set forth in the PREP Guidelines pursuant to 40 C.F.R. §§ 112.20 and 112.21.

159.    The PREP Guidelines require EPA-regulated facilities to conduct various kinds of exercises on a specified basis, including: (1) quarterly Qualified Individual Notification Exercises (PREP Guidelines App. A at p. 4-2); (2) annual Spill Management Team Tabletop Exercises, at least one of which in a triannual cycle is required to be a worst-case discharge scenario (*id.* at p. 4-5); (3) semi-annual Equipment Deployment Exercises for facilities with facility-owned equipment (*id.* at p. 4-7), or annual Equipment Deployment Exercises where the

28

facility cites Oil Spill Removal Organization ("OSRO")-owned equipment in its plan (*id.* at p. 4-9); (4) Government-Initiated Unannounced Exercises not more than triennially, if successfully completed (*id.* at p. 4-11); and (5) in a triennial cycle, three spill management team tabletop exercises – one of which must involve a worst case discharge scenario (*id.* at p. 2-19).

160.    The PREP Guidelines allow a facility to take credit for annual Equipment Deployment Exercises conducted by an OSRO as long as all the objectives of the exercise are met, the exercise is evaluated, a proper record is generated, and the facility owner or operator has received adequate documentation from the OSRO.  (*Id.* at pp. 2-8 and 4-10.)  Under the PREP Guidelines, it is the responsibility of the owner or operator of a facility to ensure that its OSRO completes the required exercises and the necessary documentation.  (*Id.* at p. 2-10.)

161.    Under the PREP Guidelines, documentation of a drill/exercise must be kept for 5 years and must include, at a minimum, the following information: (1) the type of exercise; (2) the date and time of the exercise; (3) a description of the exercise; (4) the objectives met in the exercise; (5) the components of the response plan exercised; and (6) lessons learned along with procedures and schedules for implementing lessons learned.  (*Id.* at p. A-1.)

162.    At the time of the EPA Clairton Inspection Defendant was not able to produce the following drills/exercise records required by the FRP:

    a.  Annual Equipment Deployment Exercise Records for 2014 through 2016;

    b.  Quarterly Qualified Individual Notification records for the 4th quarter of 2014 and the first through fourth quarters of 2016;

    c.  Annual Spill Management Team Tabletop Exercise records for 2015 and 2016; and

d.  Worst Case Discharge Exercise records in the triannual cycle for 2014 through

2016.

163.    Since it was Defendant's practice to keep records of drills/exercises that were

conducted, as required by law, upon information and belief, Defendant failed to conduct the

drills and exercises for which Defendant could not produce records, as described in Paragraph

162.

164.    By failing to conduct the drills and exercises as required by the PREP Guidelines,

as described in Paragraphs 162 to 163, Defendant failed to develop, implement, and document

the facility response training program and a drill/exercise program as described in its own FRP,

in violation of 40 C.F.R. § 112.21.

## COUNT 8
### PENNSYLVANIA-ONLY CLAIM
### VIOLATION OF PERMANENT CLOSURE OR CHANGE IN SERVICE
### REQUIREMENTS FOR LARGE ABOVEGROUND STORAGE TANKS - CLAIRTON

165.    The allegations in each of the preceding paragraphs are incorporated by reference

herein as though fully set forth at length.

166.    25 Pa. Code § 245.561 provides in relevant part, as follows:

Before permanent closure or change-in-service is completed the owner/operator shall

comply with the following:

(1) At least 30 days before beginning either a permanent closure or change-in-service

to an unregulated tank, or within a lesser time as determined by the Department, the

owner/operator shall notify the Department of its intent to permanently close or

change-in-service from a regulated tank to an unregulated tank, unless the action is in

response to a corrective action or waived by the Department.

(2) The owner/operator shall submit an amended registration form to the Department indicating the change in tank status within 30 days after the change in tank status.

167.    25 Pa. Code § 245.562(a), with respect to temporary removal-from-service, provides that the owner/operator shall complete and submit an amended registration form to the Department within 30 days after the change in tank status.

168.    The provisions of 25 Pa. Code §§ 245.561 and 245.562 apply to large aboveground storage tanks.

169.    "Large aboveground storage tank" is defined at 25 Pa. Code § 245.1 as "[a]n aboveground storage tank having a capacity greater than 21,000 gallons."

170.    As of the date of the EPA Clairton Inspection, the following tanks, which were registered with PA DEP as "In Use," were in fact cleaned and awaiting demolition (PA DEP's identification numbers for these tanks is provided in a parenthetical following each tank listing): V-119 (043A), V-120 (044A), V-121 (045A), V-122 (046A), V-123 (049A), V-124 (050A), V-11 (051A), V-13 (053A), V-125 (058A), V-126 (059A) and V-32 (061A).

171.    All of the tanks listed in Paragraph 170 were large aboveground storage tanks because their capacity was greater than 21,000 gallons.

172.    Under 25 Pa. Code § 245.561(2) and 245.562(a), Defendant was required to provide a timely notice to PA DEP, both prior to taking any action and following its action, that the tanks listed in Paragraph 170 were temporarily removed from service.

173.    Defendant removed Tank V-18 (PA DEP identification number 057A) on or about January 31, 2012.

174.   Under 25 Pa. Code § 245.561(2) and 245.562(a) Defendant was required to provide timely notice to PA DEP, both prior to taking any action and following its action, that the Tank V-18 (PA DEP identification number 057A) had been removed from service.

175.   By failing to provide timely notice to PA DEP of the temporary removal of service of the tanks referenced in Paragraph 170, Defendant violated 25 Pa. Code § 245.561(2) and 245.562(a).

176.   By failing to provide timely notice to PA DEP of the removal of Tank V-18 referenced in Paragraph 173, Defendant violated 25 Pa. Code § 245.561(2) and 245.562(a) of Section 1310 of the Storage Tank Act, 35 P.S. § 6021.1310.

### COUNT 9
### PENNSYLVANIA-ONLY CLAIM
### VIOLATION OF TANK HANDLING REQUIREMENTS - CLAIRTON

177.   The allegations in each of the preceding paragraphs are incorporated by reference herein as though fully set forth at length.

178.   25 Pa. Code § 245.21(a) provides as follows:

(a) Tank handling activities shall be conducted by a certified installer except in the case of modification to an aboveground nonmetallic storage tank, which may be modified by the tank manufacturer.  Storage tank facility owners and operators may not use persons who are not Department certified to conduct tank handling activities except as noted in this subsection.  The certified installer shall perform the tank handling activity or provide direct onsite supervision and control of the activity.

179.    Defendant removed tanks V-16 (PA DEP identification number 054A), V-17 (PA DEP identification number 055A), and V-18 (PA DEP identification number 057A) on or about January 31, 2012.

180.    At the time of the removal of tanks V-16 (PA DEP identification number 054A), V-17 (PA DEP identification number 055A), and V-18 (PA DEP identification number 057A), a PA DEP certified tank handler was not present.

181.    By failing to have a certified tank handler present at the time of the removal of the tanks referenced in Paragraph 180, Defendant violated 25 Pa. Code § 245.21 under Section 1310 of the Storage Tank Act, 35 P.S. § 6021.1310.

**COUNT 10**
**PENNSYLVANIA-ONLY CLAIM**
**VIOLATION OF CLOSURE REQUIREMENTS**
**FOR SMALL ABOVE GROUND STORAGE TANKS - CLAIRTON**

182.    The allegations in each of the preceding paragraphs are incorporated by reference herein as though fully set forth at length.

183.    25 Pa. Code § 245.617(a) provides:

   (a)  The owner and operator shall complete and submit an amended registration form to the Department within 30 days after the change in tank status:

184.    25 Pa. Code § 245.618(c) provides:

(c) The owner shall complete and submit an amended tank registration form, signed by the owner and the certified installer that provided direct onsite supervision of the tank handling activity, to the Department within 30 days of either of the following:

   (1) The completion of permanent closure.

   (2) Change-in-service of the tank.

185.    The provisions of 25 Pa. Code §§ 245.617 and 245.618 apply to small aboveground storage tanks.

186.    "Small aboveground storage tank" is defined at 25 Pa. Code § 245.1 as, "[a]n aboveground storage tank having a capacity equal to or less than 21,000 gallons."

187.    Tanks V-16 (PA DEP identification number 054A) and V-17 (PA DEP identification number 055A) were small aboveground storage tanks as their capacity was equal to or less than 21,000 gallons.

188.    Defendant removed tanks V-16 (PA DEP identification number 054A) and V-17 (PA DEP identification number 055A) on approximately January 31, 2012.

189.    Defendant failed to submit an amended registration form to PA DEP for Tanks V-16 (PA DEP identification number 054A) and V-17 (PA DEP identification number 055A) within 30 days as required by 25 Pa. Code § 245.618(c).

190.    By failing to submit an amended registration form to PA DEP for Tanks V-16 (PA DEP identification number 054A) and V-17 (PA DEP identification number 055A) within 30 days, Defendant violated 25 Pa. Code § 245.618(c) under Section 1310 of the Storage Tank Act, 35 P.S. § 6021.1310.

## COUNT 11
### FEDERAL-ONLY CLAIM
### INADEQUATE SPCC SECONDARY CONTAINMENT - FOLLANSBEE- 2015

191.    The SPCC Regulations require, in relevant part, that facility owners and operators construct all bulk storage tank installations with a secondary means of containment for the entire capacity of the largest single container and sufficient freeboard to contain precipitation.  40 C.F.R. § 112.8(c)(2).

192.    The SPCC Regulations require diked areas to be sufficiently impervious to contain discharged oil.  40 C.F.R. § 112.8(c)(2).

193.    The SPCC Regulations require facility owners and operators to keep comparison records and to also inspect the container's supports and foundations.  In addition, they must frequently inspect the outside of the container for signs of deterioration, discharges, or accumulation of oil inside diked areas.  Records of inspections and tests kept under usual and customary business practices satisfy the recordkeeping requirements.  40 C.F.R. § 112.8(c)(6).

194.    At the time of the EPA Follansbee 2015 Inspection, EPA inspectors observed 26 aboveground storage tanks located in a tank farm in the northern-most area of the Facility which had a total oil storage capacity of approximately 11.4 million gallons (hereinafter, "North Tank Farm").

195.    At the time of the EPA Follansbee 2015 Inspection, according to the Follansbee ICP, the largest aboveground storage tank in the North Tank Farm had an oil storage capacity of 1,073,666 gallons.

196.    At the time of the EPA Follansbee 2015 Inspection, each of the 26 tanks located in the North Tank Farm was a "bulk storage container" as defined in 40 C.F.R. § 112.2 which required a secondary means of containment pursuant to 40 C.F.R. § 112.8(c)(2).

197.    At the time of the EPA Follansbee 2015 Inspection, Defendant was required to have secondary containment to hold 1,073,666 gallons, the capacity of the largest tank located in the North Tank Farm, plus sufficient freeboard to contain precipitation pursuant to 40 C.F.R. § 112.8(c)(2).

198.    At the time of the EPA Follansbee 2015 Inspection, based on a review of the Follansbee Facility records, the secondary containment area of the North Tank Farm had less than or equal to the capacity to contain 560,000 gallons of spilled oil.

199.    At the time of the EPA Follansbee 2015 Inspection, EPA inspectors observed that the secondary containment area for the North Tank Farm had structural defects, including vegetation growing through the foundation, multiple gaps in the containment wall, and cracks in the sidewalls, floors, and curbs.

200.    On November 19, 2015, EPA and Defendant entered into an Administrative Order on Consent regarding secondary containment at the North Tank Farm.  EPA Docket No. CWA-03-2016-0007CW.

201.    The Administrative Order on Consent required, *inter alia*, that Defendant submit to EPA for review and approval a plan with an accompanying schedule to complete construction of adequate secondary containment for the North Tank Farm in accordance with the requirements of 40 C.F.R. § 112.8.

202.    While the Administrative Order on Consent included injunctive relief, it did not include a civil penalty.

203.    The Administrative Order on Consent stated the following:

   a.  EPA reserves all rights, claims, interests, and defenses it otherwise may have including but not limited to the right to pursue penalties for noncompliance.

   b.  Nothing herein shall prevent EPA from seeking legal or equitable relief to enforce the terms of this Consent Order, including the right to seek injunctive relief and/or the imposition of statutory penalties.

    c.   Nothing in this Consent Order shall constitute or be construed as a release from any claim, cause of action or demand in law or equity against any person, firm, partnership or corporation not bound by this Consent Order for any liability it may have relating in any way to the discharge of oil and/or the generation, storage, treatment, handling, transportation, release or disposal of any hazardous substances, hazardous waste, pollutants or contaminants found at, taken to, or taken from the Facility.

204.    On April 2, 2016, Defendant submitted a secondary containment completion report in accordance with paragraph 56.c of the Administrative Order on Consent, which demonstrated to EPA the completion of construction of adequate secondary containment at the North Tank Farm.

205.    By failing to provide a secondary means of containment sufficient to contain 1,073,666 gallons of spilled oil and sufficient freeboard to contain precipitation prior to April 2, 2016, Defendant violated 40 C.F.R. § 112.8(c)(2).

206.    By allowing the secondary containment area for the North Tank Farm to have structural defects, including vegetation growing through the foundation, multiple gaps in the containment wall, and cracks in the sidewalls, floors, and curbs prior to April 2, 2016, Defendant further violated 40 C.F.R. § 112.8(c)(2) by failing to ensure that the North Tank Farm secondary containment area was sufficiently impervious to contain discharged oil.

### COUNT 12
### FEDERAL-ONLY CLAIM
### INADEQUATE SPCC INTEGRITY TESTING - FOLLANSBEE - 2015

207.    The allegations in each of the preceding paragraphs are incorporated by reference herein as though fully set forth at length.

208.   40 C.F.R. § 112.8(c)(6) requires facility owners and operators to:

a.   test or inspect each aboveground container for integrity ("integrity testing") on a regular schedule and whenever they make material repairs;

b.   determine, in accordance with industry standards, the appropriate qualifications for personnel performing tests and inspections, the frequency and type of testing and inspections, which take into account container size, configuration, and design (such as containers that are: shop-built, field-erected, skid-mounted, elevated, equipped with a liner, double-walled, or partially buried).  Examples of these integrity tests include, but are not limited to: visual inspection, hydrostatic testing, radiographic testing, ultrasonic testing, acoustic emissions testing, or other systems of non-destructive testing;

c.   keep comparison records and also inspect the container's supports and foundations; and

d.   frequently inspect the outside of the container for signs of deterioration, discharges, or accumulation of oil inside diked areas.

209.   The Tank Management Plan attached to the Follansbee ICP indicated that there was a total of 92 SPCC-regulated aboveground storage tanks at the Follansbee Facility.  At the time of the EPA Follansbee 2015 Inspection, based on information provided by Follansbee personnel, 23 of the tanks were out of service but not permanently closed, 62 of the tanks were utilized for purposes of oil storage, and 7 tanks had been demolished.

210.   At the time of the EPA Follansbee 2015 Inspection, Defendant represented to EPA inspectors that only 22 of the 92 Follansbee Facility's aboveground storage tanks referenced in Paragraph 209 had undergone integrity testing since 1998.

211.    Defendant failed to provide integrity testing records for 20 of the 22 aboveground storage tanks that it claimed to have tested.

212.    At the time of the EPA Follansbee 2015 Inspection, at least 70 oil storage tanks at the Follansbee Facility had not been subjected to integrity testing as required by 40 C.F.R. § 112.8(c)(6).

213.    On November 19, 2015, EPA and Defendant entered into an Administrative Order on Consent regarding integrity testing at the Follansbee Facility.

214.    The Administrative Order on Consent required Defendant to, *inter alia*,

    a.    Submit to EPA the name and qualifications of an independent third-party consultant with sufficient qualifications and experience to evaluate all Facility above-ground oil storage tanks and their contents that had not been integrity tested;

    b.    Enter into a binding contract by which the third-party consultant would develop a schedule for prioritization of integrity testing;

    c.    Submit to EPA for its review and approval the proposed integrity testing schedule; and

    d.    Commence integrity testing based on the prioritization and schedule approved by EPA.

215.    While the Administrative Order on Consent included injunctive relief, it did not include a civil penalty.

216.    The Administrative Order on Consent stated the following:

    a.    EPA reserves all rights, claims, interests, and defenses it otherwise may have including but not limited to the right to pursue penalties for noncompliance.

b.   Nothing herein shall prevent EPA from seeking legal or equitable relief to enforce the terms of this Consent Order, including the right to seek injunctive relief and/or the imposition of statutory penalties.

c.   Nothing in this Consent Order shall constitute or be construed as a release from any claim, cause of action or demand in law or equity against any person, firm, partnership or corporation not bound by this Consent Order for any liability it may have relating in any way to the discharge of oil and/or the generation, storage, treatment, handling, transportation, release or disposal of any hazardous substances, hazardous waste, pollutants or contaminants found at, taken to, or taken from the Facility.

217.   On January 8, 2016, Defendant submitted a schedule to EPA for integrity testing of SPCC-regulated tanks at the Follansbee Facility.

218.   By failing to conduct integrity testing on tanks at the Facility prior to November 19, 2015, Defendant violated 40 C.F.R. § 112.8(c)(6).

**COUNT 13**
**FEDERAL-ONLY CLAIM**
**INADEQUATE FRP – FOLLANSBEE – 2015**

219.   The allegations in each of the preceding paragraphs are incorporated by reference herein as though fully set forth at length.

220.   40 C.F.R. § 112.20(h)(5) provides in relevant part that an FRP must provide a discussion of specific planning scenarios for discharges of different thresholds as described in that provision.

221.   40 C.F.R. § 112.20(h)(7) requires that an FRP describe how it would implement a response for the planning scenarios prepared in accordance with 40 C.F.R. § 112.20(h)(5).

222.   At the time of the EPA Follansbee 2015 Inspection, Defendant's Follansbee ICP did not include accurate information on the amount of secondary containment necessary to respond to a worst-case discharge at the North Tank Farm.

223.   At the time of the EPA Follansbee 2015 Inspection, Defendant's Follansbee ICP underestimated the amount of secondary containment necessary for 19 tanks in the North Tank Farm by approximately 11 million gallons.

224.   Because Defendant underestimated the amount of secondary containment necessary to respond to a worst-case discharge, the FRP portion of the Follansbee ICP did not include an accurate discussion of planning scenarios at different thresholds in violation of 40 C.F.R. § 112.20(h)(5).

225.   Because Defendant underestimated the amount of secondary containment necessary to respond to a worst case discharge, the FRP portion of the Follansbee ICP did not include an accurate description of how Defendant would implement a response for a worst-case discharge in violation of 40 C.F.R. § 112.20(h)(7).

<u>**COUNT 14**</u>
**FEDERAL-ONLY CLAIM**
**FAILURE TO UPDATE SPCC PLAN – FOLLANSBEE - 2018**

226.   The allegations in each of the preceding paragraphs are incorporated by reference herein as though fully set forth at length.

227.   40 C.F.R. § 112.5(a) requires, in relevant part, that when there is a change in the facility design, construction, operation or maintenance that materially affects its potential for a discharge, the facility's SPCC Plan must be amended within six months of such a change.

228.   Under 40 C.F.R. § 112.5(a), "[e]xamples of changes that may require amendment of the Plan include, but are not limited to: commissioning or decommissioning containers;

replacement, reconstruction, or movement of containers; reconstruction, replacement, or installation of piping systems; construction or demolition that might alter secondary containment structures; changes of product or service; or revision of standard operation or maintenance procedures at a facility."

229.    40 C.F.R. § 112.7(a)(3) requires, in relevant part, that a facility's SPCC Plan include a description of the physical layout of the facility and include a facility diagram, which must mark the location and contents of each fixed oil storage container and the storage area where mobile or portable containers are located.

230.    At the time of the EPA Follansbee 2018 Inspection, EPA inspectors observed approximately six 300-gallon recycle tanks and approximately 100 55-gallon drums which, according to facility personnel, were added to the facility in approximately April 2017, but which were not described in the Follansbee ICP.

231.    In addition, at the time of the EPA Follansbee 2018 Inspection, EPA inspectors observed that approximately 51 tanks had been removed from service but the ICP had not been amended to reflect this change.

232.    Lastly, at the time of the EPA Follansbee 2018 Inspection, Defendant had not included in the Follansbee ICP:

a.   The transfer area in the vicinity of tanks DF and LG; and

b.   The fuel oil tank in the vicinity of Pitch Pan 1, nor its associated transfer area.

233.    The changes described in Paragraphs 230 to 232 constitute changes in the design, construction, operation and/or maintenance of Defendant's facility that materially affected its potential for a discharge.  The Follansbee ICP did not reflect the location of oil containers,

thereby compromising the requirement that all preventive measures contemplated by the SPCC regulations were undertaken for all containers at the Facility.

234.    By failing to amend the Follansbee ICP within six months of the changes in facility design, construction, operation or maintenance that materially affected its potential for a discharge, Defendant violated 40 C.F.R. § 112.5(a).

235.    By failing to include in the Follansbee ICP the transfer area in the vicinity of tanks DF and LG and the fuel oil tank in the vicinity of Pitch Pan 1 and its associated transfer area, Defendant violated the requirement in 40 C.F.R. § 112.7(a)(3) that a facility's SPCC Plan include a description of the physical layout of the facility and include a facility diagram, which must mark the location and contents of each fixed oil storage container and the storage area where mobile or portable containers are located.

## COUNT 15
## FEDERAL-ONLY CLAIM
## VIOLATION OF FACILITY CAR AND TANK TRUCK LOADING/UNLOADING RACK REQUIREMENTS - FOLLANSBEE - 2018

236.    The allegations in each of the preceding paragraphs are incorporated by reference herein as though fully set forth at length.

237.    40 C.F.R. § 112.7(h) requires, in pertinent part, that a facility's SPCC Plan address facility tank car and tank truck loading/unloading racks and that any containment system hold at least the maximum capacity of any single compartment of a tank car or tank truck loaded or unloaded at the facility.

238.    At the time of the EPA Follansbee 2018 Inspection, EPA inspectors observed that there was no containment system for the loading rack near Tank 55, the loading rack near Tank 83, and the loading rack near the 800 series tanks.

239.    By failing to provide a containment system that holds at least the maximum capacity of any single compartment for the loading rack near Tank 55, the loading rack near Tank 83, and the loading rack near the 800 series tanks, Defendant violated 40 C.F.R. § 112.7(h).

## COUNT 16
### FEDERAL-ONLY CLAIM
### VIOLATION OF OIL-FILLED MANUFACTURING EQUIPMENT REQUIREMENTS–FOLLANSBEE - 2018

240.    The allegations in each of the preceding paragraphs are incorporated by reference herein as though fully set forth at length.

241.    Oil-filled manufacturing equipment is subject to the general requirements of 40 C.F.R. § 112.7, which provides in relevant part that a facility must prepare a Plan "that meets all of the applicable requirements listed in this part."

242.    40 C.F.R. § 112.7(a)(3) provides that a Plan must describe "the physical layout of the facility and include a facility diagram, which must mark the location of contents of each fixed oil storage container and the storage area where mobile or portable containers are located."

243.    40 C.F.R. § 112.7(a)(3)(i) provides that a facility Plan must also address "[t]he type of oil in each fixed container and its storage capacity."

244.    At the time of the EPA Follansbee 2018 Inspection, the Follansbee Facility's fume scrubbers and tube heaters, which are oil-filled manufacturing equipment, were not included in the Follansbee ICP.

245.    The fume scrubbers had an oil storage capacity of approximately 12,962 gallons and the tube heaters had an oil storage capacity of approximately 1,225 gallons.

246.    By failing to mark the location and contents of fume scrubbers and tube heaters in the Follansbee Facility's diagram, Defendant violated 40 C.F.R. § 112.7(a)(3).

**COUNT 17**
**FEDERAL-ONLY CLAIM**
**INADEQUATE SECONDARY CONTAINMENT – FOLLANSBEE - 2018**

247.    The allegations in each of the preceding paragraphs are incorporated by reference herein as though fully set forth at length.

248.    40 C.F.R. § 112.8(c)(2) requires, in relevant part, a secondary means of containment for the entire capacity of the largest single container at a facility and sufficient freeboard to contain precipitation.

249.    40 C.F.R. § 112.8(c)(2) requires diked areas to be "sufficiently impervious to contain discharged oil."

250.    Under 40 C.F.R. § 112.8(c)(2), dikes, containment curbs, and pits are commonly employed for secondary means of containment.

251.    Under 40 C.F.R. § 112.8(c)(2), an owner or operator "may also use an alternative system consisting of a drainage trench enclosure that must be arranged so that any discharge will terminate and be safely confined in a facility catchment basin or holding pond."

252.    At the time of the EPA Follansbee 2018 Inspection, based on the Follansbee ICP, Tank 13 had a capacity of approximately 67,399 gallons and Tank 14 had a capacity of approximately 67,701 gallons.

253.    At the time of the EPA Follansbee 2018 Inspection, EPA inspectors observed that Defendant did not provide secondary containment for Tanks 13 or 14.  Defendant did not provide any physical active or passive measures, such as dikes, containment curbs, or pits.

254.    At the time of the EPA Follansbee 2018 Inspection, Tanks 13 and 14 were not situated in an area with a drainage trench enclosure whereby potential discharges would terminate and be safely confined in a facility catchment basin or holding pond.

255.    At the time of the EPA Follansbee 2018 Inspection, EPA inspectors observed that Defendant did not provide secondary containment for six recycle tanks, each with a capacity of approximately 300 gallons.

256.    The six recycle tanks referenced in Paragraph 255 were located outside of all existing secondary containment areas.

257.    By failing to provide secondary containment for Tanks 13 and 14 and six recycle tanks, Defendant violated 40 C.F.R. § 112.8(c)(2).

**COUNT 18**
**FEDERAL-ONLY CLAIM**
**FAILURE TO UPDATE FRP PLAN – FOLLANSBEE - 2018**

258.    The allegations in each of the preceding paragraphs are incorporated by reference herein as though fully set forth at length.

259.    Pursuant to 40 C.F.R. § 112.20(d)(1), the owner and operator of a facility for which an FRP is required shall revise and resubmit to EPA revised portions of the FRP within 60 days of each facility change that materially may affect the response to a worst case discharge, including:

    a.  A change in the facility's configuration that materially alters the information included in the FRP;

    b.  A change in the type of oil handled, stored, or transferred that materially alters the required response resources;

    c.  A material change in capabilities of the oil spill removal organization(s) that provide equipment and personnel to respond to discharges of oil;

    d.  A material change in the facility's spill prevention and response equipment or emergency response procedures; and

e.    Any other changes that materially affect the implementation of the FRP.

260.    At the time of the EPA Follansbee 2018 Inspection, EPA inspectors observed that there were approximately six 300-gallon recycle tanks and approximately one hundred 55-gallon drums which had been added to the Facility since the EPA Follansbee 2015 Inspection but which were not reflected in the Follansbee ICP.

261.    In addition, 51 tanks had been removed from service and the Follansbee ICP had not been amended to reflect this change.

262.    The changes described in Paragraphs 260 to 261 were changes in the design and/or operation of Defendant's facility that materially affected its potential for a discharge.  The Follansbee ICP did not accurately reflect the location of oil containers, and thereby failed to reflect Facility features in the event of a discharge.

263.    By failing to amend the Follansbee ICP to reflect material changes, Defendant violated 40 C.F.R. § 112.20(d)(1).

### COUNT 19
### WEST VIRGINIA-ONLY CLAIM
### INADEQUATE SECONDARY CONTAINMENT – FOLLANSBEE FACILITY

264.    The allegations in each of the preceding paragraphs are incorporated by reference herein as though fully set forth at length.

265.    CSR § 47-63-10.2.a requires the owner or operator of aboveground storage tanks to ensure that all regulated aboveground storage tanks have a secondary containment system that collects and contains an unintentional release from an aboveground storage tank and its ancillary equipment up to the first point of isolation.

266.    CSR § 47-63-10.2.b requires all secondary containment structures to be compatible with all substances stored within the containment structure.

267.     CSR § 47-63-10.2.c requires an owner or operator ensure that secondary containment for existing regulated aboveground storage tanks to be adequately designed and constructed to be sufficiently impervious to prevent the released substance from penetrating the containment structure until the release can be detected and recovered, but in no case would that time be less than 72 hours.

268.     On October 17, 2016, March 1, 2018, April 25, 2018, September 27, 2018, April 29, 2019 and September 4, 2019, West Virginia inspectors conducted the WVDEP Follansbee Inspections in order to determine compliance with the WV Tank Act and its implementing regulations.

269.     At the time of the WVDEP Inspections, Defendant was the owner and operator of the Follansbee Facility pursuant to W. Va. Code §§ 22-30-3(5) and 22-30-3(6).

270.     At the time of the WVDEP Inspection, Defendant maintained an aboveground storage tank system as defined at CSR § 47-63-2.2 at the Follansbee Facility

271.     At all times relevant to this matter, the Follansbee Facility was a "Facility" as defined by CSR § 47-63-2.23.

272.     Over the course of the October 17, 2016, March 1, 2018, April 25, 2018, and September 27, 2018 WVDEP Inspections, WVDEP inspectors observed the following aboveground storage tanks were located within secondary containment which had not been adequately designed or constructed to be sufficiently impervious to prevent diesel, aluminum chloride, and/or coal tar contained in the aboveground storage tanks from penetrating the containment structure because a diked containment area was not present and released material would run across permeable, gravel areas:

a.   005-00000140;

    b.  005-00000191;

    c.  005-00000199;

    d.  005-00000196;

    e.  005-00000095;

    f.  005-00000143;

    g.  005-00000144;

    h.  005-00000146;

    i.  005-00000163;

    j.  005-00000198;

    k.  005-00000150; and

    l.  005-00000164.

273.    By failing to adequately design or construct the aboveground storage tanks referenced in Paragraph 272 to be sufficiently impervious to prevent the diesel, aluminum chloride, and/or coal tar from penetrating the containment structures until the release could be detected and recovered, Defendant violated CSR § 47-63-10.2.c.

<u>**COUNT 20**</u>
**WEST VIRGINIA-ONLY CLAIM**
**INADEQUATE CORROSION PROTECTION – FOLLANSBEE FACILITY**

274.    The allegations in each of the preceding paragraphs are incorporated by reference herein as though fully set forth at length.

275.    CSR § 47-63-9.2.b provides that "[r]egulated metallic AST systems with tank bottoms in direct contact with soil or other electrolytes shall be protected from corrosion, unless the tank is installed at a site that is determined by a [National Association of Corrosion

Engineers; "NACE"] certified or equivalent corrosion expert not to be corrosive enough to cause it to have a release due to corrosion during its operating life."

276.    At the time of the March 1, 2018 WVDEP Inspection, WVDEP inspectors observed that the following metallic aboveground storage tanks were not properly protected from corrosion because the tank bottoms were in contact with soil or an electrolyte and no corrosion protections measures were in place: 005-00000141 and 005-00000150.

277.    By failing to adequately protect the aboveground storage tanks referenced in Paragraph 276 from corrosion, Defendant violated CSR § 47-63-9.2.b.

### COUNT 21
### WEST VIRGINIA-ONLY CLAIM FOR INADEQUATE LEAK DETECTION – FOLLANSBEE FACILITY

278.    The allegations in each of the preceding paragraphs are incorporated by reference herein as though fully set forth at length.

279.    CSR § 47-63-10.3 provides that a facility owner or operator "shall ensure that regulated aboveground storage tank systems are monitored for leak detection at least once per calendar month, using a method or combination of methods that are capable of detecting a release from any portion of the AST."

280.    At the time of the March 1, 2018 WVDEP Inspection, the following aboveground storage tanks were not properly monitored for leak detection at least once per calendar month.

a.  005-00000094;

b.  005-00000095;

c.  005-00000102;

d.  005-00000106;

e.  005-00000109;

f.  005-00000110;

50

     g.  005-00000111;

     h.  005-00000112;

     i.  005-00000092;

     j.  005-00000122;

     k.  005-00000141;

     l.  005-00000143;

     m. 005-00000136;

     n.  005-00000144;

     o.  005-00000146;

     p.  005-00000163;

     q.  005-00000170;

     r.  005-00000187; and

     s.  005-00000199.

281.    At the time of the March 1, 2018 WVDEP Inspection, the area surrounding the aboveground storage tanks referenced in Paragraph 280 was covered in spilled product making it impossible to monitor leaks from the aboveground storage tanks.

282.    At the time of the March 1, 2018 Inspection, WVDEP inspectors observed that the appearance and characteristics of the spilled material indicated that it was not a recent or "new" spill and had been present for longer than one calendar month.

283.    By failing to adequately perform leak detection on the aboveground storage tanks referenced in Paragraph 280, Defendant violated CSR § 47-63-10.3.

**COUNT 22**
**WEST VIRGINIA-ONLY CLAIM**
**INADEQUATE EMERGENCY AND NORMAL VENTING – FOLLANSBEE FACILITY**

284.    The allegations in each of the preceding paragraphs are incorporated by reference herein as though fully set forth at length.

285.    CSR § 47-63-8.6.e provides that "[r]egulated ASTs storing flammable liquids, combustible liquids or other liquids required by industry standards or the manufacturer to have normal or emergency vents shall be so equipped to protect the tank from over-pressurization and excessive vacuums and provide relief from excessive internal pressure caused by exposure to fire.  All regulated ASTs, as applicable, shall be equipped with normal and emergency vents in accordance with API 2000, NFPA 30, UL 142, UL2583, or UL 2085."

286.    At the time of the March 1, 2018 WVDEP Inspection, WVDEP inspectors observed that aboveground storage tanks 005-00000194 and 005-00000197 were not properly equipped with emergency or normal venting on tanks containing a flammable or combustible liquid.

287.    By failing to adequately provide emergency or normal venting on the aboveground storage tanks referenced in Paragraph 286, Defendant violated CSR § 47-63-8.6.e.

**COUNT 23**
**WEST VIRGINIA-ONLY CLAIM**
**INADEQUATE TANK LABELING – FOLLANSBEE FACILITY**

288.    The allegations in each of the preceding paragraphs are incorporated by reference herein as though fully set forth at length.

289.    W. Va. Code § 22-30-11 provides that "[e]very aboveground storage tank shall display, or have displayed nearby, the tank registration number, when issued by the secretary; the

emergency contact number for the owner or operator of the tank; and the number for the

Department of Environmental Protection's Spill Reporting Hotline."

290.    At the time of the March 1, 2018 WVDEP Inspection, WVDEP inspectors

observed that aboveground storage tank 005-00000191 was not properly labeled because there

was no signage on or near the AST that provided the tank registration number, the emergency

contact number for Defendant, and the WVDEP Spill Line number.

291.    By failing to provide adequate signage for the aboveground storage tank 005-

00000191 referenced in Paragraph 290, Defendant violated W. Va. Code § 22-30-11.

**COUNT 24**
**WEST VIRGINIA-ONLY CLAIM**
**FAILURE TO REPORT A SUSPECTED OR THREATNED RELEASE –**
**FOLLANSBEE FACILITY**

292.    The allegations in each of the preceding paragraphs are incorporated by reference

herein as though fully set forth at length.

293.    CSR § 47-63-6.2.b provides that "[u]pon the occurrence of a suspected or

threatened release, owners or operators of AST systems must report the suspected or threatened

release to the Department within twenty-four (24) hours, unless the owner or operator is able to

determine within that time period that the suspected or threatened release was actually a false

alarm."

294.    At the time of the March 1, 2018 WVDEP Inspection, WVDEP inspectors

observed a sheen on water in the secondary containment area for the following aboveground

storage tanks and Defendant had failed to report the sheen as a suspected or threatened release to

WVDEP within 24 hours:

        a.   005-00000092;

        b.   005-00000094;

c.  005-00000095;

d.  005-00000102

e.  005-00000106;

f.  005-00000109;

g.  005-00000110;

h.  005-00000111;

i.  005-00000112;

j.  005-00000122;

k.  005-00000136;

l.  005-00000143;

m.  005-00000144;

n.  005-00000146;

o.  005-00000163;

p.  005-00000170;

q.  005-00000187; and

r.  005-00000199;

295.    By failing to report a suspected or threatened release to the WVDEP within 24 hours on the aboveground storage tanks referenced in Paragraph 294, Defendant violated CSR § 47-63-6.2.b.

## COUNT 25
### WEST VIRGINIA-ONLY CLAIM
### FAILURE TO REMOVE LIQUID FROM CONTAINMENT – FOLLANSBEE FACILITY

296.    The allegations in each of the preceding paragraphs are incorporated by reference herein as though fully set forth at length.

297.    CSR § 47-63-10.3.c.3 provides that "[l]iquids discovered in a double-bottomed or double walled tank or release prevention barrier structures must be immediately removed in order to continue using visual testing of these systems for leak detection."

298.    At the time of the March 1, 2018 WVDEP Inspection, WVDEP inspectors observed sheen on water in the secondary containment for the following aboveground storage tanks and the owner or operator failed to remove all liquids from the structure in order to continue to perform visual leak detection:

a.   005-00000092;

b.   005-00000094;

c.   005-00000095;

d.   005-00000102

e.   005-00000106;

f.   005-00000109;

g.   005-00000110;

h.   005-00000111;

i.   005-00000112;

j.   005-00000122;

k.   005-00000136;

l.   005-00000143;

m.  005-00000144;

n.   005-00000146;

o.   005-00000163;

p.   005-00000170;

    q.  005-00000187; and

    r.  005-00000199;

299.    By failing to remove liquids with a sheen from around the aboveground storage tanks referenced in Paragraph 298, visual leak detection could not be performed, and Defendant violated CSR § 47-63-10.3.c.3.

## COUNT 26
## WEST VIRGINIA-ONLY CLAIM
## FAILURE TO CONDUCT INTERNAL INSPECTIONS – FOLLANSBEE FACILITY

300.    The allegations in each of the preceding paragraphs are incorporated by reference herein as though fully set forth at length.

301.    CSR § 47-63-5.3.f provides that "[i]f an existing regulated AST has not had an internal inspection, an internal inspection must be performed within" certain timeframes.  CSR § 47-63-5.3.f.1 required aboveground storage tanks that were 75 years or older to be inspected by August 1, 2017.  CSR § 47-63-5.3.f.2 required aboveground storage tanks that were between 50 and 75 years to be inspected by August 1, 2018.

302.    At the time of the September 27, 2018 WVDEP Inspection, the following aboveground storage tanks had not been internally inspected within the required time frames based upon inquiries made to the company and a review of facility files provided to WVDEP:

    a.  005-00000198; required internal inspection was due on or before August 1, 2017

    b.  005-00000141; required internal inspection was due on or before August 1, 2017

    c.  005-00000150; required internal inspection was due on or before August 1, 2017

    d.  005-00000092; required internal inspection was due on or before August 1, 2018 and

    e.  005-00000187 required internal inspection was due on or before August 1, 2018.

303.    By failing to ensure timely internal inspections for the aboveground storage tanks referenced in Paragraph 302, Defendant violated CSR § 47-63-5.3.f.

### COUNT 27
### WEST VIRGINIA-ONLY CLAIM
### FAILURE TO TIMELY PAY FEES – FOLLANSBEE FACILITY

304.    The allegations in each of the preceding paragraphs are incorporated by reference herein as though fully set forth at length.

305.    CSR § 47-64-3.2.a provides that "[t]he Secretary shall collect an annual operating fee from owners of Level 1 and Level 2 ASTs that have not undergone permanent closure or change-in-service to a non-regulated tank."

306.    CSR § 47-64-4.1 provides that "[t]he Secretary shall provide to each tank owner an invoice for the fees assessed pursuant to this Rule.  The invoice shall include an itemized list of fees assessed and the date upon which the fees are due and payable.  The invoice shall be provided in the form and manner as prescribed by the Secretary."

307.    CSR § 47-64-4.2 provides that "[f]ees assessed pursuant to this Rule shall be paid by check, money order, credit card or bank draft payable to the West Virginia Department of Environmental Protection.  Payment of the entire amount of the fees assessed, as calculated on the assessment invoice, must be made in a single payment."

308.    CSR § 47-64-6.1 provides that "[a] tank owner who does not make full, timely payment of fees assessed pursuant to this Rule, or who otherwise fails to comply with the provisions of this Rule, may be subject to penalties provided in the Aboveground Storage Tank Act, W. Va. Code § 22-30-17."

309.    On November 15, 2018, WVDEP sent Defendant an invoice for operating fees due for remittance on January 14, 2019.

310.     On or about August 5, 2019, WVDEP conducted a file review and determined that Defendant had failed to make full timely payment of fees assessed for the following regulated aboveground storage tanks:

a.  005-00000094;

b.  005-00000095;

c.  005-00000102

d.  005-00000106;

e.  005-00000109;

f.  005-00000110;

g.  005-00000111;

h.  005-00000112;

i.  005-00000115

j.  005-00000123;

k.  005-00000143;

l.  005-00000144;

m. 005-00000163;

n.  005-00000165;

o.  005-00000170;

p.  005-00000187;

q.  005-00000191;

r.  005-00000196;

s.  005-00000197; and

t.  005-00000198.

311.    By failing to pay fees assessed pursuant to the AST fee rule for the aboveground

storage tanks referenced in Paragraph 310, Defendant violated CSR § 47-64-6.1.

**<u>COUNT 28</u>**
**FEDERAL-ONLY CLAIM**
**INADEQUATE SPCC PLAN DIAGRAM – GREEN SPRING**

312.    The allegations in each of the preceding paragraphs are incorporated by reference

herein as though fully set forth at length.

313.    40 C.F.R. § 112.7(a)(3) requires, in relevant part, that a facility's SPCC Plan

include a description of the physical layout of the facility and include a facility diagram, which

must mark the location and contents of each fixed oil storage container and the storage area

where mobile or portable containers are located.

314.    40 C.F.R. § 112.7(a)(3) requires the facility diagram to also include all transfer

stations and connecting pipes.

315.    40 C.F.R. § 112.7(a)(3) requires the SPCC Plan to also address the type of oil in

each fixed container and its storage capacity and discharge prevention measures including

procedures for routine handling of products and discharge or drainage controls.

316.    At the time of the EPA Green Spring Inspection, EPA inspectors observed that the

Green Spring Facility's ICP:

   a.  did not reflect any of the oil storage drums or transfer areas in the facility

       diagram;

   b.  included a description for the containment area for Tank 37 which was different

       from the actual containment area;

   c.  referenced a concrete containment dike for Tank 37 which was not present at the

       time of the EPA Green Spring Inspection;

    d.   included a description for the containment area for Tank 4 which was different from the actual containment area;

    e.   inaccurately showed that Tank 4 was located in a concrete containment basin although Tank 4 was actually located in a plastic containment basin; and

    f.   included a table of facility tanks which was inaccurate because it included tanks that had been removed from the Green Spring Facility.

317.    By failing to maintain the Green Spring ICP accurately as described in Paragraph 316, Defendant violated the requirements in 40 C.F.R. § 112.7(a)(3).

**COUNT 29**
**FEDERAL-ONLY CLAIM**
**FAILURE TO INCLUDE PREDICTION OF DIRECTION OF FLOW OF A DISCHARGE IN SPCC PLAN – GREEN SPRING**

318.    The allegations in each of the preceding paragraphs are incorporated by reference herein as though fully set forth at length.

319.    40 C.F.R. § 112.7(b) provides, in pertinent part, that where experience indicates a reasonable potential for equipment failure, a facility's SPCC Plan must include a prediction of the direction, rate of flow, and total quantity of oil which could be discharged from the facility as a result of each type of major equipment failure.

320.    In 2011, the Green Spring Facility had one spill of creosote originating from a drip pan that overflowed during heavy rains.

321.    In 2014, the Green Spring Facility had three spills of creosote.

322.    Two of the spills referenced in Paragraph 321 originated from piping and the third spill originated from a temporary oil storage tank.

323.    In 2015, the Green Spring Facility had two spills of creosote originating from Tank 62.

324.    One of the spills of creosote from Tank 62 escaped the containment dike.

325.    The creosote spill events described in Paragraphs 320 through 324 gave Defendant notice that there was a reasonable potential for equipment failure thereby requiring Defendant's Green Spring ICP to include a prediction of the direction, rate of flow, and total quantity of oil which could be discharged from its Green Spring Facility as a result of each type of major equipment failure.

326.    At the time of the EPA Green Spring Inspection, the Green Spring ICP did not include a prediction of the direction, rate of flow, and total quantity of oil for any discharge scenarios from any type of equipment failure.

327.    By failing to include in the Green Spring ICP a prediction of the direction, rate of flow, and total quantity of oil which could be discharged from the Green Spring Facility as a result of each reasonably potential equipment failure, Defendant violated 40 C.F.R. § 112.7(b).

**COUNT 30**
**FEDERAL-ONLY CLAIM**
**VIOLATION OF SPCC PLAN INSPECTION RECORD KEEPING REQUIREMENTS –**
**GREEN SPRING**

328.    The allegations in each of the preceding paragraphs are incorporated by reference herein as though fully set forth at length.

329.    40 C.F.R. § 112.7(e) requires, in relevant part, that facilities conduct inspections and tests required by Part 112 in accordance with written procedures; the procedures and a record of inspections and tests, signed by the appropriate supervisor or inspector, must be kept with the SPCC Plan for a period of 3 years.

330.    The Green Spring Facility maintained written procedures for the different types of inspections it conducted, including a form for an "Aboveground Storage Tank Inspection

Checklist," which was described as a "monthly inspection of aboveground tanks to monitor external tank condition and its containment structure."

331.    At the time of the EPA Green Spring Inspection, EPA inspectors reviewed 3 years of visual records and observed that none of the visual records were signed by the appropriate supervisor or inspector.

332.    At the time of the EPA Green Spring Inspection, inspection forms included tanks no longer present at the Green Spring Facility.

333.    By failing to maintain a record of inspections and tests signed by the appropriate supervisor or inspector, Defendant violated 40 C.F.R. § 112.7(e).

334.    By failing to maintain an accurate description of tanks to be inspected, Defendant violated 40 C.F.R. § 112.7(e).

### COUNT 31
### FEDERAL-ONLY CLAIM
### INADEQUATE PERSONNEL, TRAINING, AND DISCHARGE PREVENTION PROCEDURES – GREEN SPRING

335.    The allegations in each of the preceding paragraphs are incorporated by reference herein as though fully set forth at length.

336.    40 C.F.R. § 112.7(f) requires, in relevant part, that facilities, at a minimum, train oil-handling personnel in the operation and maintenance of equipment to prevent discharges, discharge procedure protocols, applicable pollution control laws, rules, and regulations, general facility operations and the contents of the facility SPCC Plan.

337.    At the time of the EPA Green Spring Inspection, based on information and documentation provided to EPA inspectors, the Green Spring Facility did not conduct SPCC training for the operation and maintenance of equipment to prevent discharges, discharge

procedure protocols, applicable pollution control laws, rules and regulations, and the contents of the facility SPCC plan.

338.    By failing to have or implement a SPCC training program that met the requirements of 40 C.F.R. § 112.7(f)(1), as described in Paragraph 337, Defendant violated 40 C.F.R. § 112.7(f)(1).

**COUNT 32**
**FEDERAL-ONLY CLAIM**
**INADEQUATE SPCC SECONDARY CONTAINMENT – GREEN SPRING**

339.    The allegations in each of the preceding paragraphs are incorporated by reference herein as though fully set forth at length.

340.    40 C.F.R. § 112.8(c)(2) requires, in relevant part, a secondary means of containment for the entire capacity of the largest single container and sufficient freeboard to contain precipitation.

341.    The SPCC Regulations require diked areas to be sufficiently impervious to contain discharged oil.  40 C.F.R. § 112.8(c)(2).

342.    At the time of the EPA Green Spring Inspection, Defendant failed to provide a secondary means of containment for the entire capacity and sufficient freeboard to contain precipitation for Tank 37.

343.    Defendant's February 2015 ICP indicated that Tank 37 had a capacity of approximately 475,200 gallons and was fully contained within a concrete secondary containment dike.

344.    EPA inspectors observed during the 2017 EPA Green Spring Inspection that the concrete dike surrounding Tank 37 was incomplete, with only three sides of the dike mostly intact.

345.    In addition, EPA inspectors further observed during the 2017 Green Spring Inspection cracks in the remaining concrete walls.

346.    By failing to ensure that the diked area surrounding Tank 37 was sufficiently impervious to contain discharged oil, Defendant failed to provide a secondary means of containment in violation of 40 C.F.R. § 112.8(c)(2).

**COUNT 33**
**FEDERAL-ONLY CLAIM**
**INADEQUATE SPCC INTEGRITY TESTING – GREEN SPRING FACILITY**

347.    The allegations in each of the preceding paragraphs are incorporated by reference herein as though fully set forth at length.

348.    40 C.F.R. § 112.8(c)(6) requires facility owners and operators to:

a.    test or inspect each aboveground container for integrity ("integrity testing") on a regular schedule and whenever they make material repairs;

b.    keep comparison records and to also inspect the container's supports and foundations; and

c.    frequently inspect the outside of the container for signs of deterioration, discharges, or accumulation of oil inside diked areas.

349.    40 C.F.R. § 112.8(c)(6) states that "[r]ecords of inspections and tests kept under usual and customary business practices satisfy the recordkeeping requirements of this paragraph."

350.    At the time of the EPA Green Spring Inspection, Defendant was unable to produce records of integrity testing for Tank 37.

351.    Based on conversations with Defendant's personnel, at the time of the EPA Green Spring Inspection, Defendant had not conducted integrity testing for Tank 37.

352.     By failing to conduct integrity testing for Tank 37, Defendant violated 40 C.F.R. § 112.8(c)(6).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, the United States of America, the Commonwealth of Pennsylvania and the State of West Virginia respectfully request that the Court enter judgment against the Defendant, as follows:

(A)     Issue an injunction pursuant to Section 311(e) of the CWA, 33 U.S.C. § 1321(e), requiring Defendant to achieve permanent and consistent compliance with the CWA and all applicable statutory and regulatory requirements at its Follansbee Facility;

(B)     Assess civil penalties against the Defendant pursuant to Section 311(b)(7)(C) of the CWA, 33 U.S.C. § 1321(b)(7)(C), for each of the Defendant's violations of the CWA and the regulations promulgated thereunder;

(C)     Assess civil penalties against Defendant pursuant to Section 1307 of the Pennsylvania Storage Tank and Spill Prevention Act, 35 P.S. § 6021.1307, and Section 605 of the Pennsylvania Clean Streams Law, 35 P.S. § 691.605, for each of Defendant's violations of Pennsylvania state law;

(D)     Assess civil penalties against Defendant pursuant to W. Va. Code § 22-30-17(c), for each of Defendant's violations of West Virginia state law;

(E)     Award the United States its costs of bringing this action;

(F)     Award the Commonwealth of Pennsylvania its costs of bringing this action;

(G)     Award the State of West Virginia its costs of bringing this action; and

(H)     Grant such other relief as the Court may deem just and proper.

Respectfully Submitted,

FOR THE UNITED STATES OF AMERICA

NATHANIEL DOUGLAS
Deputy Section Chief
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice

/s/Alexandra B. Sherertz
ALEXANDRA B. SHERERTZ
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 514-0414
Fax: (202) 514-0097
E-mail: Alexandra.Sherertz@usdoj.gov

/s/Stephanie K. Savino
STEPHANIE K. SAVINO
Assistant United States Attorney
WV Bar No. 13684
United States Attorney's Office
1125 Chapline Street, Suite 3000
P.O. Box 591
Wheeling, WV 26003
Phone: (304) 234-0100
Fax: (304) 234-0112
E-mail: Stephanie.K.Savino@usdoj.gov


FOR THE STATE OF WEST VIRGINIA

KATHERYN D. EMERY
Acting Director
Division of Water and Waste Management
West Virginia Department of Environmental Protection
601 57th Street SE
Charleston, WV 25304

SCOTT DRIVER
Senior Counsel

West Virginia Department of Environmental Protection
601 57th Street SE
Charleston, WV 25304

FOR THE COMMONWEALTH OF PENNSYLVANIA

DIANE D. MCDANIEL, P.E.
Program Manager
Environmental Cleanup and Brownfields Program
PA Department of Environmental Protection
Southwest Regional Office
400 Waterfront Drive
Pittsburgh, PA 15222
Phone: (412)442-4153
Email: dimcdaniel@pa.gov

EDWARD S. STOKAN
Assistant Regional Counsel
Office of Chief Counsel
PA Department of Environmental Protection
Southwest Regional Office
400 Waterfront Drive
Pittsburgh, PA 15222
Phone: (412)442-4249
Fax: (412)442-4274
Email: estokan@pa.gov

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2020, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system, which will notify the parties of record.


/s/Stephanie K. Savino
STEPHANIE K. SAVINO